

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 20, 2014**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 13-30678-BJH |
| PROVIDER MEDS, LP, | § | (Chapter 7) |
| | § | |
| DEBTOR. | § | |
| | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |
| | § | |
| CERx PHARMACY PARTNERS, LP, *et al.*, | § | ADV. PROC. NO. 14-3031-BJH |
| | § | |
| | § | Related to Dkt. No. 43 |
| PLAINTIFFS, | § | |
| v. | § | |
| | § | |
| RPD HOLDINGS, LLC, *et al.*, | § | |
| | § | |
| DEFENDANTS. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING
## RPD HOLDINGS, LLC'S MOTION FOR PARTIAL JUDGMENT
## ON THE PLEADINGS (CERX LICENSE AGREEMENT CLAIMS)

Before the Court is the Motion of RPD Holdings, LLC for Partial Judgment on the Pleadings (CERx License Agreement Claims) [Dkt. No. 43] (the "**Motion**") and related brief in support [Dkt. No. 44] ("**RPD's Pre-Hearing Brief**"), in which RPD Holdings, LLC ("**RPD**") requests that this Court dismiss Count 1 of the Second Amended Complaint [Dkt. No. 34, as amended by Dkt. No. 119] (the "**Complaint**")[1] filed by CERx Pharmacy Partners, LP ("**CERx**"). The Court held a hearing on the Motion on July 16, 2014. At the conclusion of the hearing, the Court directed additional briefing on several issues. The last of those briefs was filed on July 18, 2014. The Motion is now ripe for ruling. For the reasons discussed below, the Court concludes that (1) CERx has failed to plead sufficient facts as to Count 1 of the Complaint to state a claim for relief that is plausible on its face, and (2) RPD is entitled to a judgment on the pleadings as to Count 1. Accordingly, the Motion will be granted.

## I.    RELEVANT STANDARD FOR DECIDING THE MOTION

### A.    Federal Rule of Civil Procedure 12(c)

RPD brings the Motion under Federal Rule of Civil Procedure 12(c), which provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c); *see also* FED. R. BANKR. P. 12(b) (incorporating FED. R. CIV. P. 12(b) – (i)). Judgment on the pleadings is appropriate when there are only questions of law and no disputed issues of fact. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001). A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,*

---

[1] Subsequent to the hearing, while the Motion was under advisement, CERx filed its Third Amended Complaint [Dkt. No. 119]. For purposes of the Motion, the Second Amended Complaint and the Third Amended Complaint are substantively identical. As such, the Court will consider the Motion as a request for a judgment on the pleadings as to Count 1 of the Third Amended Complaint.

313 F.3d 305, 313 n.8 (5th Cir. 2002)). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes,* 278 F.3d at 420 (internal quotation omitted) (citation omitted). Although the Court must accept the factual allegations in the pleadings as true, *id.*, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The determining issue is not whether the plaintiff will ultimately prevail on the merits, but whether he is entitled to offer evidence to support his claim." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 418-19 (5th Cir. 2004) (citing *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)) (analyzing Rule 12(b)(6)). Therefore, a court will not dismiss a plaintiff's claim, "unless the plaintiff will not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in his complaint." *Id.* (internal quotation omitted) (citation omitted).

## B.   The Documents Admitted into Evidence and Considered by the Court

Generally, in considering a motion under Rule 12(c), the Court "must limit itself to the contents of the pleadings, including attachments thereto." *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (considering a Rule 12(b)(6) motion). If the Court is presented with matters outside the pleadings and does not exclude them, "the motion must be treated as one for summary judgment [and] ... [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d); *see In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

However, the Fifth Circuit has recognized "one limited exception" to this rule. *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Under that exception, documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim. *Id.* at 536 (citing *Collins*, 224 F.3d at 498–99). Thus, for a document to be incorporated into the pleadings under this exception, it

must (1) be attached to a defendant's motion to dismiss, (2) be referred to in the plaintiff's complaint, and (3) be central to the plaintiff's claims. *Katrina Canal Breaches Litig.*, 495 F.3d at 205.

In support of the Motion, RPD provided the Court and CERx with a voluminous Appendix[2] that included the following documents: (App. A) Patent Security Agreement dated effective as of May 6, 2011 (the "**PSA**") between debtor Provider Meds, LP ("**PM**") and CERx; multiple, substantially-identical Software License and Service Agreements dated March 8, 2011 between non-debtor Provider Technologies, Inc. ("**Provider Tech.**") and PM, on the one hand, and various affiliated-entity/licensees on the other hand, including (App. B) non-debtor OnSiteRx of Phoenix, LLC ("**Phoenix**"), (App. C) debtor ProvideRx of Grapevine, LLC ("**Grapevine**"), (App. D) debtor ProvideRx of Midland, LLC ("**Midland**"), (App. E) debtor ProvideRx of San Antonio, LLC ("**San Antonio**"), (App. F) debtor ProvideRx of Waco, LLC ("**Waco**"), and (App. G) debtor W. Pa. OnSiteRx, LLC ("**W. Pa.**") (these Software License and Service Agreements, along with a similar agreement executed by Alta Source, Inc. ("**Alta Source**") and PM,[3] are collectively referred to herein as the "**License Agreements**"); (App. H) CERx Proof of Claim filed against the Grapevine bankruptcy estate [Bankr. Case No. 12-38039, Claim No. 13-1]; (App. I) CERx Proof of Claim filed against the W. Pa. bankruptcy estate [Bankr. Case No. 13-32615, Claim No. 33-1]; (App. J) Order Granting Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same

---

[2] RPD did not file its Appendix of public record on the docket, but copies were provided to CERx and the Court prior to the hearing, and, as discussed below, portions of the Appendix were admitted into evidence at the hearing.

[3] According to the Complaint, "[t]he putative Alta Source license is essentially the same as the other licenses, except that the Alta Source license has a complete description of what is being licensed and the other licenses do not." Complaint at ¶ 47. The Complaint does not allege when the Alta Source License Agreement was executed, only that it was executed after March 8, 2011. *Id.* at ¶ 68.

**MEMORANDUM OPINION AND ORDER**                                                              **4**

[Bankr. Case No. 12-38039, Dkt. No. 270]; (App. K) Order Granting Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same [Bankr. Case No. 13-32615, Dkt. No. 144]; (App. L) CERx Pharmacy Partners, LP's Objection to the Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same [Bankr. Case No. 12-38039, Dkt. No. 157]; (App. M) CERx Pharmacy Partners, LP's Objection to the Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same [Bankr. Case No. 13-32615, Dkt. No. 135]; (App. N) UCC-1 Financing Statement filed by Alta Source listing San Antonio as the debtor; (App. O) UCC-1 Financing Statement filed by Southwest Securities, FSB[4] listing Grapevine as the debtor; (App. P) Declaration of Davor Rukavina; and (App. Q) Declaration of John Clement.[5]

In light of the three requirements that documents must satisfy under Fifth Circuit precedent to be considered in a Rule 12(c) context, the Court raised concerns at the beginning of the hearing on the Motion regarding whether it may properly consider the documents at App. H through Q without converting the Motion to one brought under Rule 56. *See* FED. R. CIV. P. 12(d). At the hearing, the Court noted that, although it may take judicial notice of the pleadings and claims on its docket, none of the documents at App. H through Q were referenced in the Complaint, nor do they appear central to CERx's claims. Instead, these documents appear to relate solely to RPD's defense.

---

[4] Alta Source has purchased Southwest Securities, FSB's claims against various estates.

[5] The purpose of the two declarations is to attest to the authenticity of the other documents in the Appendix.

In light of the Court's concerns, RPD withdrew its request that the Court consider the documents at App. H through O.[6]  With that withdrawal in hand, counsel for CERx stated his consent that the Court consider the Motion under the standards of Rule 12(c).  The documents at Apps. A through G were then admitted into evidence at the hearing without objection.  At CERx' request, the Non-Binding Term Sheet dated May 6, 2011 (the "**Term Sheet**) executed by PM, the Gillum Family Master Heritage Trust (the "**Trust**"), and CERx was also admitted into evidence without objection.[7]

## II.    FACTUAL AND PROCEDURAL BACKGROUND[8]

OnSiteRx, a debtor before this Court, is the ultimate direct and/or indirect corporate parent of various entities[9] that operated in the pharmacy services industry and were engaged in the business of providing remotely distributed and disbursed pharmaceutical products to patient care facilities such as nursing homes and other institutions.  Complaint at ¶¶ 13, 52.  The non-patented intellectual property underlying the OnSiteRx system is the primary subject of the

---

[6] In this regard, RPD also withdrew its argument in the Motion that it is entitled to a judgment on the pleadings as to the License Agreements involving Grapevine and W. Pa. because RPD purchased those License Agreements pursuant to Court orders containing the protections of 11 U.S.C. § 363(f).  *See* Motion at ¶ 11.  As such, this Memorandum Opinion and Order does not address that argument.

[7] A copy of the Term Sheet may be found at Exhibit A to CERx's Post-Hearing Brief [Dkt. No. 83].

[8] A more detailed description of the relationship between these parties may be found in the Memorandum Opinion Granting Motion for Reconsideration and, Upon Reconsideration, Addressing Motions for Partial Summary Judgment [Adv. Proc. No. 13-3015, Dkt. No. 157] (the "**Memorandum Opinion (2013 Adversary)**") entered by this Court on March 13, 2014 in the adversary proceeding styled *CERx Pharmacy Partners, LP v. Provider Meds,, LP, et. al*, 13-3015-BJH (the "**2013 Adversary**").  For purposes of the Motion, however, the Court is limiting its analysis to the allegations contained within the Complaint and the documents admitted into evidence at the hearing on the Motion.

[9] The following OnSiteRx entities are currently debtors in bankruptcy proceedings pending before this Court: OnSiteRx, Inc. (13-30267), ProvideRx of Grapevine, LLC (12-38039), Provider Technologies, Inc. (13-33020), Provider Meds, LP (13-30678), Provider Business Solutions, Inc. (13-33022), Pharmacy Solutions, L.P. (13-30268), ProvideRx of Midland, LLC (13-33016), ProvideRx of Waco, LLC (13-33017), ProvideRx of San Antonio, LLC (13-33018), and W PA OnSiteRx, LLC (13-32615).  Each of these cases has been converted to Chapter 7 and a trustee appointed.  As relevant here, John Spicer serves as trustee for the OnSiteRx estate, Diane Reed serves as trustee for the PM estate, James Cunningham serves as trustee for the San Antonio estate, and Jeff Mims serves as trustee for the Waco estate.

current dispute, particularly the proprietary source code used to operate the system (the "**Source Code**").

As alleged in the Complaint,[10] prepetition, CERx loaned, among other amounts, $1.5 million to PM pursuant to the terms of various loan and security documents dated effective May 6, 2011 (collectively, the "**May 6 Loan Documents**").  *Id.* at ¶¶ 21, 31.  According to CERx, the May 6 Loan Documents include: (1) the Term Sheet, (2) a May 6, 2011 Convertible Promissory Note in the amount of $1,500,000.00 between PM as the borrower and CERx as the lender; (3) a First Loan Modification Agreement dated May 6, 2011, (4) the PSA, (5) a Collateral Assignment, and (6) two Note Purchase Agreements that are dated June 21, 2010 and November 5, 2010.  *Id.* at ¶¶ 21-22.[11]  CERx alleges that it was only after it had entered into the May 6 Loan Documents, and funded thereunder, that it learned that PM was a party to the various License Agreements that, as described by CERx, are perpetual, royalty-free licenses that permit the licensees to use and modify the Source Code, thus greatly reducing the value of CERx's collateral.  *Id.* at ¶¶ 49-51, 54.  Per the Complaint, the notes owing by PM to CERx became due and payable according to their terms, but were not paid.  *Id.* at ¶ 15.  CERx then allegedly conducted a public sale of its collateral on December 13, 2012, at which it was the sole bidder and purchased all of "the IP collateral" with a $750,000 credit bid.  *Id.* at ¶ 16.

Through Count 1 of the Complaint, CERx asserts various causes of action against the parties to the License Agreements, requesting that the Court rescind the License Agreements because they were allegedly the result of wrongful actions that were taken in breach of the PSA and intended to deprive CERx of its collateral, including allegations that the License Agreements

---

[10] For purposes of the Motion, the Court will consider the allegations contained in the Complaint as true.  *Hughes*, 278 F.3d at 420.

[11] Of the various May 6 Loan Documents, only the PSA and the Term Sheet were admitted into evidence at the hearing on the Motion.

**MEMORANDUM OPINION AND ORDER**                                                                7

were back-dated so as to appear to precede the security interests granted to CERx. A brief discussion of the documents granting CERx its security interests, namely the Term Sheet and PSA, is necessary to place these allegations into context.

First, pursuant to the Term Sheet:

[t]he Purchaser shall be granted a senior security interest in the IP assets of the Issuer and any affiliates … and the Guarantor shall provide the Purchaser with a senior security interest in the IP assets owned by Guarantor or any affiliates….

Term Sheet [Dkt. No. 83] at ¶ 6. Per to the Complaint, "Purchaser" refers to CERx, "Borrowers" refers to PM, "Issuer" refers to OnSiteRx, and "Trust" refers to the Trust. *Id.* at ¶ 30. Moreover, according to the Defendants' organizational chart (as described by CERx): (1) the Trust owns 100% of OnSiteRx; (2) OnSiteRx owns 100% of Grapevine and 99% of PM, while the other 1% of PM is owned by Provider Tech., which is wholly owned by OnSiteRx; (3) PM owns (directly or indirectly) 100% of Midland, Waco, and San Antonio and 60% of Phoenix and W. Pa.; and (4) the members of the Gillum family, as beneficiaries of the Trust, own and control 100% of the equity interests in every OnSiteRx-affiliated company, except Phoenix and W. Pa. which are owned 40% by third parties. *Id.* at ¶ 52. Accordingly, per the Complaint, "CERx was to receive as collateral all of the IP Assets of all of the OnSiteRx Companies,[12] which includes both PM and Grapevine and all of the other OnSiteRx Companies." *Id.* at ¶ 33. Notably, however, the Term Sheet does not contain any representations, warranties, or covenants regarding the collateral granted therein.

In turn, the PSA grants CERx a lien and security interest in various "Collateral" defined as:

---

[12] According to the Complaint, the Trust and Reef Gillum owned the various "**OnSiteRx Companies**," which is defined to include Provider Tech., PM, Pharmacy Technologies, Inc., Pharmacy Solutions, LP, Provider Business Solutions, Inc., Grapevine, Provide Rx of PA, LLC, W. PA, Midland, Waco, and San Antonio. *Id.* at ¶¶ 23- 24.

(a) U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No. PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications"); and

(b) Any contract rights in, to or under the Patent Applications;

together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

PSA [App. A] at ¶ 2. The PSA also contains various representations, warranties, and covenants

regarding the "Collateral," including that:

(a) Obligor [PM] is the sole owner of the Collateral.

(b) The Collateral is not subject to any security interest, Lien, prior assignment, or other encumbrance of any nature whatsoever.

*Id.* at § 5(a), (b). And that:

(a) The Obligor will keep the Collateral free and clear of any and all security interest, liens, assignments or other encumbrances and the Obligor shall not enter into any licenses with respect to the Collateral, except as approved by Lender [CERx].

*Id.* at § 6(a).

With this background in mind, the Court will now turn to the merits of the Motion.

## III.    LEGAL ANALYSIS

In the Motion, RPD seeks a judgment on the pleadings as to the entirety of Count 1 of the

Complaint titled "License Agreements."[13]   Count 1 of the Complaint subsumes four separate

---

[13]  As discussed in more detail below, CERx seeks rescission of each of the License Agreements involving Grapevine, Waco, San Antonio, Midland, W. Pa., Phoenix, and Alta Source. Of the seven License Agreements, RPD alleges that it owns four of them, including that it purchased the Grapevine and W. Pa. License Agreements via Court-approved bankruptcy sales, it foreclosed on the Phoenix License Agreement, and took assignment of the Alta

claims related to the License Agreements, including: (1) if the License Agreements were executed prior to May 6, 2011, PM failed to disclose this material information to CERx, breaching the representations and warranties contained in the PSA[14] and fraudulently inducing CERx to enter into the May 6 Loan Documents, Complaint at ¶¶ 67, 70; (2) alternatively, if the License Agreements were executed after May 6, 2011 and back-dated to March 8, 2011, the License Agreements are forged and thus the result of actual fraud, *id.* at ¶¶ 65, 70; (3) alternatively, if the License Agreements were executed after May 6, 2011, the licensees, specifically Grapevine, Midland, Waco, San Antonio, W. Pa., Phoenix and Alta,[15] tortiously interfered with the PSA and CERx's security interests granted thereunder, *id.* at ¶¶ 66, 70; and (4) alternatively, the License Agreements (other than the Alta Source License Agreement) are missing a material term and are unenforceable, *id.* at ¶ 71. *See* CERx's Pre-Hearing Brief [Dkt. No. 67] (the "**CERx's Pre-Hearing Brief**") at 3. In each instance, CERx argues that monetary damages are insufficient and that the Court must rescind the License Agreements in order to afford CERx a full and adequate remedy. Complaint at ¶ 68.

The Court will address each of CERx's Count 1 claims in turn below.

## A. Fraudulent Inducement

Texas law imposes a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. *See Holloway v. Dekkers*, 380 S.W.3d 315, 324 (Tex. App. – Dallas 2012, no pet.). Fraudulent inducement "is a particular species of fraud

---

Source License Agreement. RPD Pre-Hearing Brief [Dkt. No. 44] at ¶ 9-12. RPD further alleges that it holds a perfected security interest in the Midland, Waco, and San Antonio License Agreements. *Id.* Although the Court is not determining the validity of RPD's alleged ownership in this Memorandum Opinion, it notes these allegations for purposes of RPD's standing to bring the Motion as to the entirety of Count 1 and also notes that no party, including CERx, has objected to the Motion on the grounds that RPD lacks standing to seek dismissal of Count 1 in its entirety and as it relates to each of the License Agreements.

[14] The Complaint, however, does not contain a count alleging breach of contract.

[15] CERx is no longer pursing tortious interference claims against Midland, Waco, and San Antonio. *See* CERx's Pre-Hearing Brief [Dkt. No. 67] at ¶ 45.

that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001); *accord Holloway*, 380 S.W.3d at 324. To allege a claim of fraudulent inducement, a plaintiff must adequately plead a claim for common law fraud, including that (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *T. O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). Further, the allegations must "relate to an agreement between the parties." *Haase*, 62 S.W.3d at 798-99.

Turning to the Complaint, Count 1 alleges that:

> The Court should terminate and rescind the [License Agreements] if [they were] executed before the May 6, 2011 transactions, because [they were] the result of PM's fraudulent representation and warranty, which induced CERx into the May 6, 2011 and all subsequent transactions, that no such agreements existed. [The licensees] had full knowledge of and participated in PM's conduct in defrauding CERx. CERx loaned millions of dollars based on that false representation. Reef Gillum was the president and CEO of and operated both entities [licensor and licensee]. The Court should therefore exercise its equitable powers to either terminate and rescind the [License Agreements] or to order PM to do so itself.

Complaint at ¶ 67.

For the reasons detailed below, the Court concludes that the Complaint fails to adequately plead a claim for fraudulent inducement.

### 1. The Fraudulent Inducement Allegations Do Not Relate to an Agreement Between the Parties

As an initial matter, the Court notes the apparent disconnect between the alleged wrong and the remedy sought. CERx has alleged that PM induced it to enter into the May 6 Loan Documents to which CERx and PM are signatories. Instead of seeking rescission of its contracts

– *i.e.*, the May 6 Loan Documents, however, CERx is seeking to rescind the License Agreements between PM and the third party licensees. Notably, CERx is not a party to the License Agreements and the licensees are not parties to the May 6 Loan Documents. However, as discussed above, for a claim of fraudulent inducement to stand, the allegations must relate to an agreement between the parties. *Haase*, 62 S.W.3d at 798-99. If CERx were seeking to rescind the May 6 Loan Documents, this requirement would be met. CERx, however, is seeking to rescind the License Agreements, to which it is not a party. Thus, the Court concludes that the Complaint's allegations of fraudulent inducement do not relate to an agreement between the parties.

There are other reasons why CERx's claim of fraudulent inducement fails, which the Court will now address.

### 2. No Material or False Representation was Made to CERx

#### a) CERx's Security Interest in Non-Patent Related Intellectual Property Arose by Operation of the Term Sheet

In its Complaint, CERx alleges that:

On or about July 10, 2012, CERx learned that PM had purported software license and services agreements with Grapevine – as well as with the Arizona, Pa., Midland, Waco, and San Antonio pharmacies – all allegedly dated March 8, 2011, approximately two months BEFORE the May 6, 2011 representation and warranty that no assignments or encumbrances of any nature whatsoever existed regarding CERx's Collateral.

\*\*\*

If the license agreements in fact existed before May 6, 2011 then PM breached the Security Agreement's [PSA's] representation and warranty that there were no assignments or encumbrances of any kind whatsoever burdening the Collateral. Not only is there a breach of warranty, but PM committed fraud as the representation was a statement of material fact on which CERx reasonably relied, repeatedly, to its detriment in making numerous loans to PM based on the truth of that representation. As a result, the value of CERx's Collateral has been diminished substantially.

Complaint at ¶¶ 47, 57.  Notably, CERx's allegations presume that its security interests arose under, or were governed by, the PSA.  Thus, as an initial matter, the Court must determine (1) whether CERx's alleged security interests in the non-patent related collateral arose under the PSA or the Term Sheet, and (2) if CERx's security interests in the non-patent related collateral arose under the Term Sheet, whether the PSA and the Term Sheet should be read as a single, integrated document so that any representations, warranties, and covenants contained in the PSA would apply to all of CERx's collateral.

The Court previously addressed the scope of the collateral granted under the PSA and the Term Sheet in the Memorandum Opinion (2013 Adversary).  Similar to the case at hand, CERx argued in the 2013 Adversary that the definition of "Collateral" contained in the PSA, by use of the phrase "all other intellectual property," shows the parties' objective intent that the PSA grant CERx a security interest in all of PM's intellectual property.  The Court disagreed with this argument in the 2013 Adversary with respect to PM and does so again now with respect to the other OnSiteRx Companies.

Notably, the PSA defines "Collateral" as:

(a) U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No.  PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, **corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world**, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications"); and

(b) Any contract rights in, to or under the Patent Applications;

together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

PSA [App. A] at ¶ 2 (emphasis added). As explained in the Memorandum Opinion (2013 Adversary):

> This Court cannot read the phrase "all other intellectual property" in isolation from the rest of the paragraph, but must take its meaning from the surrounding words. *Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 665 n.16 ("Under Texas law, the words of a contract must be read in context…") (citing *U.S. Fid. and Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) ("Under the traditional canon of construction *noscitur a sociis* ('a word is known by the company it keeps'), each of the words used [in the insurance contract at issue] must be construed in context.")). First, the term "corresponding" must refer to another portion of the paragraph. Here, it clearly refers back to the previously and immediately-listed patent applications. Also, there is no demarcation between "rights to patent" and "all other intellectual property protections;" as such, the entire phrase is limited by the term "corresponding" and expressly relates to the patents. For the phrase to have the meaning posited by CERx, it would read "corresponding rights to patent~~, and~~ all other intellectual property ~~protection~~ of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations…". The precedent discussed above, however, does not permit such an isolated reading of the phrase "all other intellectual property." *Id.* The plain meaning of this paragraph is that "corresponding rights to patent and all other intellectual property protection of every kind…in all countries of the world" grants exactly what is says – it grants rights in patents and corresponding rights to patent-like protections in all countries of the world.

Memorandum Opinion (2013 Adversary) at 29. Thus, for the same reasons discussed in § II.1.a of the Memorandum Opinion (2013 Adversary), the Court concludes that the definition of "Collateral" contained in the PSA is only sufficient to grant CERx a security interest in PM's patents and patent-related rights.

On the other hand, the Term Sheet contains a much broader grant of collateral:

> [t]he Purchaser shall be granted a senior security interest in the IP assets of the Issuer and any affiliates … and the Guarantor shall provide the Purchaser with a senior security interest in the IP assets owned by Guarantor or any affiliates….

Term Sheet [Dkt. No. 83] at ¶ 6. For purposes of this Memorandum Opinion and Order, the Court will assume that, as alleged in the Complaint, CERx was granted a security interest in all of the intellectual property owned by OnSiteRx and the OnSiteRx Companies. For the reasons

previously explained, however, its interests in the non-patent related intellectual property could only have arisen by operation of the Term Sheet, not the PSA.

>    **b)**      **The Term Sheet Does Not Contain Any Representations, Warranties, or Covenants Regarding the Collateral**

As previously noted, the Term Sheet contains no representations, warranties, or covenants regarding the collateral granted. However, CERx argues that, because the May 6 Loan Documents are allegedly part of a single transaction, the documents must be construed together, so that the representations, warranties, and covenants contained in the PSA cover all collateral in which CERx was granted a security interest. In support of this argument, CERx argues that the Court has already ruled in its favor on this issue:

> First, the Court held [in the Memorandum Opinion (2013 Adversary)] that, "Pursuant to the May 6 Loan Documents, PM granted CERx a security interest in all of its IP Assets." (Case 13-03015-bjh, Doc. 159, p. 2). The May 6 Loan Documents include, among others, the May 6 Term Sheet and the May 6, 2011 security agreement [PSA]. (Case 13-03015-bjh, Doc. 157, p. 20). And, after discussing and applying the rules of construction that require consistent contemporaneous documents regarding a transaction to be construed together, the Court held that, "Under the undisputed facts of this case, the May 6 Loan Documents clearly show the parties' objective intent that CERx be granted a security interest in PM's IP Assets." (Case 13-03015-bjh Doc. 157, pp. 34-37, 50). Thus, the Term Sheet and the security agreement are construed together and the representation applies to the licenses.

CERx's Pre-Hearing Brief [Dkt. No. 67] at ¶ 28.

In response, RPD argues that the License Agreements, which allegedly pre-dated the May 6 Loan Documents, do not breach the representations and warranties contained in the PSA because: (1) the PSA's representations and warranties regarding prior encumbrances only apply to "Collateral," as defined in the PSA, which does not include the Source Code, and (2) even if the PSA's representations and warranties covered the Source Code, the License Agreements are not "encumbrances" under the PSA. As discussed in more detail below, the Court finds RPD's first point persuasive and concludes that the representations, warranties, and covenants contained

in the PSA are not extended so as to cover all collateral in which CERx was granted a security interest.[16]

### (1)    The May 6 Loan Documents Cannot Be Construed to Form a Single, Fully-Integrated Contract

As an initial matter, the Court notes that CERx made a substantially similar argument regarding contractual integration in the 2013 Adversary in the context of cross-motions for summary judgment.  In the 2013 Adversary, CERx argued that the security grant contained in the Term Sheet was integrated into and modified the terms of the PSA via (1) the Convertible Promissory Note executed by PM and CERx (the "**Convertible Note**") and (2) the First Loan Modification Agreement executed by PM, the Trust, and CERx (the "**FLMA**"), both of which were before the Court in the 2013 Adversary.  In the 2013 Adversary, the Court concluded that the May 6 Loan Documents must be construed together to determine the parties' objective intent regarding whether a security interest was created in PM's intellectual property assets.  Memorandum Opinion (2013 Adversary) at 35-36.  The Court's prior ruling, however, did not hold that the May 6 Loan Documents must be read on a fully integrated basis so that the PSA's representations, warranties, and covenants would apply to all collateral interests granted to CERx.

Notably, many of the May 6 Loan Documents reference other May 6 Loan Documents,[17] and, under Texas precedent, documents that incorporate or reference other documents may be considered on an integrated basis.  *Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.*, 409

---

[16] Because the Court finds RPD's first argument dispositive on this issue, this Memorandum Opinion and Order does not address RPD's second argument.

[17] For example, the PSA contains a defined term describing the FLMA and states that "[t]his Patent Security Agreement, together with the First Loan Modification Agreement and the documents referenced therein, constitutes the entire agreement between the Obligor and the Secured Party with respect to the subject matter hereof…."  PSA [App. A.] at §§ 1, 14(j).  The Court detailed the relationship between the various May 6 Loan Documents in the Memorandum Opinion (2013 Adversary).  *See* Memorandum Opinion (2013 Adversary) at 33-34.

S.W.3d 181, 188-89 (Tex. App. – Dallas 2013, no pet.).  Such integration, however, cannot run contrary to the express terms of the documents themselves.  Indeed, it is a canon of contractual interpretation that the Court "consider the entire writing and attempt to harmonize and give effect to all provisions of the contract by analyzing the provisions with reference to the whole agreement."  *Frost Nat'l Bank v. L & F Distrib., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Assoc.*, 205 S.W.3d 46, 55–56 (Tex. App. – Dallas 2006, pet. denied).  This Court must also bear in mind the particular business activity to be served, and, when possible and proper to do so, avoid a construction that is unreasonable, inequitable, and oppressive.  *Frost Nat'l. Bank,* 165 S.W.3d at 312; *Reilly v. Rangers Mgmt., Inc*., 727 S.W.2d 527, 530 (Tex. 1987).

Based upon its review of the PSA and the Term Sheet, the Court concludes that interpreting the PSA and the Term Sheet as a single, textually-integrated contract, as CERx suggests, would work contrary to the plain and unambiguous language of the documents themselves.  Indeed, it is clear from the documents that the Term Sheet granted CERx a security interest in various intellectual property, and the PSA was the mechanism by which CERx documented this security interest with respect to patents and patent-related rights held by PM.  As discussed in § III.A.2.a), *supra*, the PSA's definition of "Collateral" clearly describes patent and patent-related rights.  If the parties had intended that the terms of the PSA extend to all collateral interests granted to CERx, the PSA's definition of "Collateral" would have included much broader language that expressly covered all intellectual property.  Looking within the four corners of the documents, there is simply nothing in the plain and unambiguous language of the Term Sheet or the PSA that reflects the parties' objective intent that the collateral restrictions contained in the PSA extend to all intellectual property in which CERx was granted a security

**MEMORANDUM OPINION AND ORDER**                                                                                    **17**

interest.  *See Tex. v. Am. Tobacco Co.,* 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document…."); *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.,* 88 F.3d 347, 352 (5th Cir. 1996) (same); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.* 907 S.W.2d 517, 520 (Tex. 1995) (same).

The Court's conclusion regarding contractual integration also makes sense in light of the particular business activity to be served, here a secured commercial loan transaction.  Indeed, adopting CERx's argument would create case law whereby a court is to construe all documents in a loan transaction as a single, textually-integrated contract.  Such a ruling would read terms into commercial loan and security documents not only contrary to the express terms of those documents, but also contrary to common business practice.  For example, a standard commercial loan transaction often involves numerous documents, with each serving a specialized purpose – *e.g.*, promissory notes, security agreements, blocked account agreements, UCC-1 Financing Statements, etc.  Under CERx's argument, each of those documents would be read together as a single contract, and parties would lose the ability to have different collateral treated in different ways, regardless of the express terms of individual documents.

An example of the effect of such a ruling can be found within the PSA itself, which references the Assignment attached thereto as Exhibit A.  Per § 9 of the PSA (titled "Remedies"), the Assignment was executed by PM and delivered to CERx to be held in escrow unless and until the occurrence of a default under the PSA.  At that time, CERx was authorized, in its sole and absolute discretion, and without notice, to record the Assignment with the U.S. Patent and Trademark Office (the "**USPTO**"), at which time the "Patent Rights," as defined in the Assignment, would be permanently assigned to CERx.  PSA at § 9(b).  Were the Court to read the May 6 Loan Documents on a textually integrated basis, as urged by CERx, CERx would have

taken full assignment of all intellectual property owned by the OnSiteRx-affiliated companies upon PM's default and the filing of the Assignment with the USPTO, without any further action or notice. This outcome would be nonsensical because filing a document with the USPTO would clearly not affect a transfer of non-patent related rights, not to mention the transfer would also violate numerous statutes, including the notice and foreclosure laws in the Texas Uniform Commercial Code.

Instead, CERx was granted exactly what the Term Sheet says – a senior security interest in various intellectual property. The PSA then served as the mechanism by which CERx documented its security interest in PM's patents and patent-related rights. CERx, however, failed to require that the OnSiteRx-affiliated companies sign a separate security agreement covering "all intellectual property," which could have included the representations, warranties, and covenants CERx now seeks to impose or some other representations, warranties, and covenants bargained for by CERx. This Court declines CERx's invitation to "fully integrate" the May 6 Loan Documents to correct its documentation error.

CERx alternatively argues that, even if this Court were to conclude that the PSA does not cover the Source Code, PM nonetheless made a material, false representation when it "told CERx that CERx would receive all of the affiliates' IP Assets. But, because the license already existed, it was impossible for PM to deliver 100% of the fee simple bundle of rights." CERx's Post-Hearing Brief [Dkt. No. 83] at ¶ 4; *see also id.* at ¶ 9 (alleging that PM represented that CERx would receive "the full fees [*sic*] simple title"). The Court, however, disagrees. Presumably, CERx is referring to the language in the Term Sheet stating that it would receive a "senior security interest in the IP assets." Term Sheet [Dkt. No. 83] at ¶ 6. By its plain and unambiguous language, however, the Term Sheet does not state that CERx would receive fee

simple title to the various items of intellectual property. It simply states that CERx would receive a "senior security interest" in those assets, without any accompanying representation, warranty, or covenant. And, as RPD appears to concede, that is exactly what CERx received. RPD Post-Hearing Brief at ¶ 4 ("Rather, the Term Sheet provides that CERx would be provided with a 'senior security interest in the IP assets of the Issuer and any affiliates.' *See* Term Sheet at ¶ 6. But that was provided, there is no fraud, and it is CERx's fault alone that it failed to perfect any security interest against the affiliates.").

Finally, CERx argues that, under Texas law, silence can be "fraud by omission" if a party had a duty to speak. CERx's Post-Hearing Brief [Dkt. No. 83] at ¶¶ 13-14. The Complaint, however, does not allege a claim of fraud by omission. *See* Complaint at ¶¶ 65-71 ("Count 1: License Agreements). Further, as argued in its brief, CERx's non-pleaded claim of fraud by omission is based upon Grapevine's alleged duty to correct CERx's impression that it "would receive the full fee simple rights when [Grapevine] (and PM) knew that was not possible." CERx's Post-Hearing Brief [Dkt. No. 83] at ¶ 14. As discussed immediately above, however, the Term Sheet only states that "Purchaser shall be granted a senior security interest…," Term Sheet [Dkt. No. 83] at § 6, which is exactly what CERx received.

Taking the facts alleged in the Complaint as true, the Court concludes that (1) CERx's security interest in its non-patent related collateral arose by operation of the Term Sheet, which does not contain any type of representation, warranty, or covenant regarding the collateral interests granted therein, nor did it purport to grant CERx fee simple title to the various items of intellectual property; (2) the representations, warranties, and covenants in the PSA do not apply to CERx's non-patent related collateral; and (3) thus, the Complaint fails to identify a fraudulent misrepresentation regarding CERx's collateral that could serve as the basis for a claim for

fraudulent inducement. As such, construing the Complaint in the light most favorable to CERx, the Court concludes that the Complaint fails to state a plausible claim of fraudulent inducement. Thus, the Court will grant the Motion with respect to Count 1, fraudulent inducement.[18]

### 3. Rescission as a Remedy

Even if the Complaint did adequately state a plausible claim of fraudulent inducement, CERx is not entitled to the requested relief. Notably, the traditional remedies for a claim of fraudulent inducement are rescission of the underlying contract or monetary damages. *See, e.g., Isaacs v. Bishop*, 249 S.W.3d 100, 109 (Tex. App. – Texarkana 2008, pet denied) ("[A]n allegedly defrauded plaintiff has a choice to make, whether to claim the equitable remedy of rescission for fraud and try to get his or her property back or to affirm the transaction and seek damages."); *Nelson v. Najm*, 127 S.W.3d 170, 176 (Tex. App. – Houston [1st Dist.] 2003, pet. denied) ("Texas courts have long held under general principles of common-law fraud that one who is induced by fraud to enter into a contract has a choice of remedies: he may either recover his monetary damages flowing from the fraud or he may elect the equitable remedy of rescission in lieu of damages and demand a return of any amount paid."). The Court will address the available remedies in turn.

First, to be entitled to the equitable remedy of rescission, a party must show that (1) he and the defrauding party are in the status quo (*i.e.*, there are no retained benefits received under the instrument and not restored to the other party), or (2) there are equitable considerations that obviate the need for the status quo relationship. *Isaacs*, 249 S.W.3d at 110 (citing cases). An

---

[18] Due to the Court's conclusion that CERx's security interest in the non-patent related intellectual property arose by operation of the Term Sheet, not the PSA, it need not address RPD's alternative argument that § 9.401(b) of the Texas UCC prohibits CERx from rescinding the License Agreements. *See* TEX. BUS. & COM. CODE § 9.401(b) ("An agreement between the debtor and secured party that prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect."). Because the Term Sheet does not contain such a prohibition, § 9.401(b) is inapplicable on its face.

inability to return the parties to their former position should be considered in determining whether rescission would be equitable. *Id.* (citing *Ennis v. Interstate Distribs., Inc.*, 598 S.W.2d 903, 906 (Tex. App. – Dallas 1980, no writ)). Here, assuming the facts as alleged in the Complaint as true, CERx funded at least $1,500,000 under May 6 Loan Documents, PM defaulted on the loan, and CERx foreclosed upon its collateral. Thus, there are clearly retained benefits remaining on both sides, and rescission of the License Agreements will not change this, nor return the parties to the status quo ante.

In further support of its request for rescission, CERx cites to various cases that stand for the general proposition that monetary damages can be inadequate in certain instances, for example in cases involving the transfer of real estate. Post-Hearing Brief [Dkt. No. 83] at ¶¶ 17-26. Although rescission may be an appropriate remedy when unique assets are involved, CERx, continues to gloss over the facts that: (1) creation of the License Agreements was not a breach of the PSA, the Term Sheet, or any other document before this Court, (2) CERx is not a party to the License Agreements that it seeks to rescind, and (3) it was the May 6 Loan Documents, not the License Agreements, that CERx alleges was the result of PM's fraudulent inducement. Further, each case cited to by CERx holding that rescission was an appropriate remedy involved a party seeking to rescind a contract to which it was a party. Indeed, the Court was unable to locate a case that ordered rescission of a contract that the plaintiff was not a party to.

Second, with respect to monetary damage, CERx has filed proofs of claim against the various bankruptcy estates, but nonetheless argues that monetary damages would not afford it an adequate remedy because the various debtor-parties are insolvent. As an initial matter, the Court acknowledges that Texas case law holds that a party's insolvency is a factor to be considered by the Court in determining whether a legal remedy is adequate; however, that consideration

appears to arise primarily in the context of requests for injunctive relief. *See Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 621-22 (Tex. App. – Dallas 2004, no pet.) (citing cases); *Surko Enters. Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex. App. – Houston [1st Dist.] 1989) (holding in the context of a request for temporary injunction that "[a] plaintiff does not have an adequate remedy at law if the defendant is insolvent"). However, in this instance, state law considerations, particularly ones that do not appear on point, cannot trump the priority scheme established by Congress when it enacted the Bankruptcy Code. *See* U.S. CONST. art. I, § 8, cl .4 (providing that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States").

Moreover, in bankruptcy, virtually all debtors are insolvent. Acceptance of CERx's argument would establish precedent holding that damages cannot afford the creditor of a bankrupt an adequate remedy at law. This clearly is not the law or the priority scheme established by the Bankruptcy Code to ensure equal treatment of similarly situated creditors. Thus, the Court finds unpersuasive CERx's arguments that the unique nature of its collateral, coupled with the pending bankruptcy cases of the OnSiteRx-affiliated companies, prohibits monetary damages from being an adequate remedy at law.

Thus, CERx has two forms of available relief – monetary damages and/or rescission of the May 6 Loan Documents. Choosing neither in the context of this adversary proceeding, CERx instead asks this Court to create a new, equitable remedy for the alleged wrong – rescission of contracts to which it is not a party. CERx's problems, however, arise not from PM's actions, but from its failure to perfect its security interests in non-patent related collateral. The Court will not create a new remedy to compensate for the shortcomings in CERx's security documents.

Accordingly, for the foregoing reasons, the Court concludes that CERx is not entitled to rescission of the License Agreements on grounds of fraudulent inducement.

### B.    Actual Fraud by Forgery

In the event that the License Agreements were executed after the May 6 Loan Documents, CERx alternatively argues that PM has committed actual fraud.  As alleged in the Complaint:

> This Court should terminate and rescind [the License Agreements], because [each is] a fraudulent agreement that was created after the May 6, 2011 Security Agreement and backdated to appear as though it predates that Security Agreement. [The licensees] knowingly participated in that fraud.

Complaint at ¶ 65.  CERx further alleges that, if the License Agreements are permitted to stand, they will greatly reduce the value of CERx's collateral by permitting the OnSiteRx-affiliated companies to use and modify the Source Code, despite it having been pledged to CERx.  *Id.* at ¶¶ 54, 59.  As clarified in its pre-hearing brief, CERx argues that these actions constitute "actual fraud" or, more particularly, "actual fraud by forgery."  CERx' Pre-Hearing Brief [Dkt. No. 67] at ¶ 16 ("CERx asserts a common law 'actual fraud' by forgery claim, which would render the licenses void *ab initio*.").

Per CERx, "actual fraud" is defined to include dishonesty of purpose or intent to deceive. *Id.* at ¶ 17 (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986); *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)).  Further,

> [g]enerally speaking, fraud is an elusive and shadowy term that includes "any cunning or artifice used to cheat or deceive another." *Garcia v. Rutledge*, 649 S.W.2d 307, 312 (Tex. App. – Amarillo 1982, no writ); *see also First State Bank of Miami v. Fatheree*, 847 S.W.2d 391, 396 (Tex. App. – Amarillo 1993, writ denied) (discussing at length the breadth of deceptive activities that fraud encompasses).  Not all fraud is comprehended by the traditional elements of fraud in the inducement. *McEwin v. Allstate Texas Lloyds*, 118 S.W.3d 811, 816 (Tex. App. – Amarillo 2003, no pet.).  Fraud is multiform and admits of no single, all-encompassing definition.  *See id.*   "The gist of fraud is successfully using cunning, deception or artifice to cheat another to the other's injury." *Id.*

*Id.* Because of this, CERx argues that a plaintiff need not satisfy the traditional elements of common law fraud when alleging actual fraud by forgery. More specifically, CERx argues that the allegedly back-dated License Agreements were part of the OnSiteRx entities' use of cunning, deception, and artifice to deprive it of the rights it was granted in the May 6 Loan Documents. *Id*. at ¶¶ 17-24.

The Court, however, finds CERx's cases on this point distinguishable and concludes that, to maintain its cause of action for fraud based on the allegedly back-dated documents, the Complaint must adequately plead the elements of common-law fraud, which the Complaint has failed to do. Moreover, the Court notes that CERx failed to cite to any Texas case law or statute giving rise to a claim of "actual fraud by forgery," nor could the Court locate such a case or statute. Instead, in its briefing, CERx analogized its claim to the crime of forgery, as defined under the Texas Penal Code. *Id.* at ¶ 18 (citing to TEX. PEN. CODE § 32.21(a)(1)(A)(ii), (b)). CERx, however, is clearly not raising criminal charges in this civil court.

Further, the cases cited to by CERx for the proposition that the elements of common law fraud do not apply to this claim are clearly distinguishable. Notably, each of the courts in *McEwin*, *Fatheree*, and *Garcia* were analyzing the use of fraud as an affirmative defense, rather than fraud as a cause of action. *See McEwin* 118 S.W.3d at 816; *Fatheree,* 847 S.W.2d. at 397; *Garcia* 649 S.W.2d at 311. Indeed, *McEwin* specifically acknowledged the application of the traditional elements of fraud when proving an actionable claim for fraud. *McEwin* 118 S.W. 3d at 816. Because CERx does not seek to use fraud as an affirmative defense, these cases are inapposite.[19]

---

[19] This distinction has been noted by at least one other court. *See Compaq Computer Corp. v. Ergonome Inc.*, No. H-97-1026, 2001 WL 34104826, *8 (S.D. Tex. 2001).

Accordingly, the Court concludes that, to survive RPD's request for a judgment on the pleadings as to Count 1 (actual fraud related to the alleged forgery), the Complaint must adequately plead a cause of action for common law fraud, in that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *T. O. Stanley Boot Co.*, 847 S.W.2d at 222. For the reasons explained below, the Court concludes that the Complaint fails to adequately plead a claim for actual fraud.

First, the Complaint must adequately plead that PM made a material and false representation. Here, the allegations are that PM and each licensee fraudulently back-dated the License Agreements so as to pre-date the security interests granted to CERx, and that these material and false representations concerned the date these agreements were actually signed. What the Complaint fails to allege, however, is how CERx relied on the alleged misrepresentations contained in the License Agreements.

Taking the facts in the Complaint as true, CERx did not learn of the existence of the back-dated License Agreements until on or about July 10, 2012, well after it entered into the May 6 [2011] Loan Documents. Complaint at ¶¶ 21, 47. The Court appreciates that, under the facts as pleaded, CERx would not have signed or funded under the May 6 Loan Documents had it been aware of the License Agreements allegedly covering its collateral, but any injury to CERx could not have resulted from its alleged reliance on the execution date contained in each License Agreement, of which it was unaware.

Finally, CERx argues that back-dating the License Agreements for the improper purpose of depriving it of its collateral resulted in forged documents that are void *ab initio*. CERx Post-Hearing Brief [Dkt. No. 28] at ¶ 30 (citing *Dwairy v. Lopez*, 243 S.W.3d 710, 712 (Tex. App. – San Antonio 2007, no pet.)). The Court, however, finds the case cited by CERx clearly distinguishable from the facts at hand. The *Dwairy* court, analyzing a recorded mineral deed with a forged signature, relied upon the established rule that a "forged deed is void *ab initio* [and] passes no title." *Id*. at 712 (internal citations omitted). This is so because, in the case of a forged signature, the grantee had no title to convey and, thus, title could not legally pass.

Here, however, there is no dispute that the signatories to the License Agreements, both licensor and licensee, had authority to sign those documents and that those signatures are authentic. Further, CERx does not argue that PM could not execute valid license agreements, only that it should not have done so in deference to CERx's alleged lien position. The only "forgery" at issue is the alleged back-dating, and this Court could not find, nor did CERx cite to, any case holding that a back-dated instrument with a valid and authorized signature is insufficient to pass title, making the instrument void *ab initio*.

As such, construing the Complaint in the light most favorable to CERx, the Court concludes that the Complaint fails to state a plausible claim of actual fraud based upon the allegedly back-dated License Agreements. Thus, the Court will grant the Motion with respect to Count 1, fraudulently back-dated documents.

### C.    Tortious Interference

Under Texas law, a claim for tortious interference has four elements: (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) the act was a proximate cause of the plaintiff's damages, and (4) actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). In its Complaint, CERx alleges that:

> This Court should terminate or rescind the [License Agreements] because [the licensees] executed [the License Agreements] after May 6, 2011 with full knowledge that the license agreement was not executed with CERx's knowledge or consent. Thus, [licensee's] conduct tortiously interfered with the Security Agreement and CERx's security interest in the Collateral.

Complaint at ¶ 66.

In response, RPD argues that: (1) the License Agreements do not constitute an encumbrance under the PSA, so there can be no interference with the May 6 Loan Documents, and (2) as a matter of law, a claim for tortious interference cannot stand between a parent and its subsidiary. Because the Court finds RPD's first argument on this point dispositive as to each licensee, this Memorandum Opinion and Order does not address RPD's second argument.

### 1. The License Agreements Are Not an "Encumbrance" under the PSA

In its Complaint, CERx alleges that each licensee tortiously interfered with the PSA because it entered into a License Agreement with the knowledge that the agreement was executed without CERx's consent. Complaint at ¶ 66. Thus, as an initial matter, the Court must determine whether CERx's consent was necessary under the PSA for the parties to execute the License Agreements or, in other words, whether the parties' execution of the License Agreements was prohibited by the PSA. For the reasons explained below, the Court concludes that the PSA did not prohibit or otherwise restrict entry into the License Agreements; thus, entry into the License Agreements could not tortiously interfere with the PSA.

Section 6 of the PSA, titled "Covenants Concerning Collateral" states that: "[t]he Obligor [PM] will keep the Collateral free and clear of any and all security interests, liens, assignments or other encumbrances and the Obligor shall not enter into any licenses with respect to the Collateral, except as approved by Lender [CERx]." PSA at § 6(a). As explained in § III.A.2.a), *supra*, however, the term "Collateral" as defined in the PSA does not include the Source Code or other non-patent related intellectual property. As such, for the reasons previously explained, the

Court concludes that:  (1) any security interest CERx was granted in the Source Code and other non-patent related intellectual property arose by operation of the Term Sheet, (2) the Term Sheet contains no representations, warranties, or covenants regarding the collateral granted to CERx therein, and (3) the terms and restrictions in the PSA only apply to the patent and patent-related collateral granted to CERx by PM.  *See* § III.A.2, *supra*.  Accordingly, neither PM nor the various licensees were required to obtain CERx's approval to enter into the License Agreements, and entry into the License Agreements could not tortiously interfere with the PSA.

Thus, construing the Complaint in the light most favorable to CERx, the Court concludes that the Complaint fails to state a plausible claim of tortious interference.  Accordingly, the Court will grant the Motion with respect to Count 1, tortious interference.

### D.       Unenforceability of License Agreements

CERx next alleges that the License Agreements among the OnSiteRx-affiliated companies are each unenforceable because they are missing a material term in that each fails to describe the subject matter being licensed.[20]   Complaint at ¶ 71.  Reviewing the pleadings, however, the Court is hard-pressed to find how CERx, who is not a party to or a third party beneficiary of the License Agreements, has standing to challenge the enforceability of these agreements based upon the alleged lack of a material term.  *See, e.g., Taynor v. Foremost Lloyds of Tex.*, No. 10-12-00105, 2013 WL 856265, *4 (Tex. App. – Waco 2013, no pet.) ("Under the general law of contracts, a party must show either privity or third-party-beneficiary status in order to have standing to sue."); *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.* 234 S.W.3d 726, 728 (Tex. App. – Dallas 2007, pet. denied) (same).

Further, each subject licensee (other than Phoenix) and the licensor is a Chapter 7 debtor before this Court.   As such, any claim that a License Agreement involving a debtor is

---

[20] CERx does not make this argument as against Alta Source.

unenforceable is property of the relevant bankruptcy estate.  *See* 11 U. S. C. § 541(a).  As explained by the Fifth Circuit:

> The filing of a bankruptcy petition creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The phrase "all legal or equitable interests of the debtor in property" has been construed broadly, and includes "rights of action" such as claims based on state or federal law.  *See Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir. 1983); *In re Educators Group Health Trust*, 25 F.3d at 1283.  If a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it. *In re Educators Group Health Trust*, 25 F.3d at 1284.

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum)*, 522 F.3d 575, 584 (5th Cir. 2008).  Finally, the Court can see no basis upon which CERx would have standing to assert this claim on behalf of RPD,[21] who is seeking to dismiss Count 1.

For these reasons, the Court concludes that CERx does not have standing to request that the Court rescind the License Agreements due to the alleged absence of a material term. Accordingly, the Motion is granted with respect to Count 1, agreement unenforceable due to absence of a material term.

### E.    CERx Has No Standing to Seek to Rescind Contracts to which it is Not a Party

Although the Court has previously concluded that the Motion should be granted as to the entirety of the Count 1 claims, it will nonetheless further address CERx's argument that, if successful on one or more of its Count 1 claims, it would be entitled to rescission of the License Agreements.  For the reasons discussed below, the Court disagrees.

At the hearing, the Court expressed its concern that, through Count 1, CERx was seeking to rescind contracts to which it was neither a party nor a third party beneficiary.  After hearing

---

[21]   This assumes that RPD purchased the License Agreements involving W. Pa. and Grapevine, foreclosed on the Phoenix License Agreement, and took assignment of the Alta Source License Agreement.

**MEMORANDUM OPINION AND ORDER**                                          **30**

the parties' respective arguments, the Court requested additional briefing on this issue. In its post-hearing brief, CERx cites to a single case in support of its argument that "Texas law rejects the privity requirement for rescission in a fraud case where the perpetrator intended to harm the victim." CERx's Post-Hearing Brief [Dkt. No. 83] at ¶¶ 1, 15-16 (citing *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760 (Tex. App. – Houston [14th Dist.] 2001, pet. denied)). This case, however, does not address the Court's concerns regarding privity.

In *Sandefer*, stock purchasers Sandefer and Smith brought claims of common law fraud and fraud under the Texas Securities Act against a brokerage firm (Texas Capital), a stock broker (Johnson), a stock promoter (Ballow), and a stock issuer (Titan). *Id.* at 768. Johnson and Titan, however, settled with the plaintiff prior to trial. *Id.* The jury found that Ballow committed common law fraud against Sandefer and Smith, who elected a judgment against Ballow solely for rescission. *Id.* 773. As part of the rescission, Sandefer and Smith tendered their Titan stock to the trial court, and Ballow was held jointly and severally liable for the $359,000 purchase price. *Id.* On appeal, Ballow argued that rescission of the stock purchase requires privity of contract, and he was not a party to the stock purchase. *Id.* Thus, according to Ballow, "rescission against a non-party to the contract would be fundamentally inconsistent with the very concept of rescission." *Id.*

In its post-hearing brief, CERx relies upon a lengthy quote from the *Sandefer* decision that facially appears to support its argument, the relevant portions of which follow:

> Despite Ballow's assertions, rescission has long been a remedy for common law fraud. *Adickes v. Andreoli*, 600 S.W.2d 939, 945–47 (Tex. Civ. App. – Houston [1st Dist.] 1980, writ dism'd).
>
> The jury found Ballow offered or sold a security to appellees. Ballow contends neither he nor Titan sold stock in Titan to appellees. When Sandefer was asked if Ballow sold him the Titan stock, Sandefer replied, "He did not *directly* sell me this stock." (Emphasis added.) Sandefer was then asked if he relied on anything Ballow said to him before he purchased the stock. Again, Sandefer's response

was, "That he said *directly* to me?" Ballow did not sell the stocks directly to the buyers, but remained insulated by the brokers. This does not, however, mean he cannot be held accountable in rescission upon findings of fraudulent misrepresentations through a broker. *See Shatterproof Glass Corp. v. James*, 466 S.W.2d 873, 876–77 (Tex. Civ. App. – Fort Worth 1971, writ ref'd n.r.e.) (the courts have replaced "privity" and "primary benefit" with the concepts of "good faith" and "common honesty").

The decision to grant an equitable remedy such as rescission is within the discretion of the trial court. *Schenck v. Ebby Halliday Real Estate, Inc*., 803 S.W.2d 361, 366 (Tex. App. – Fort Worth, 1990, no writ). The trial court did not abuse its discretion when it held Ballow responsible and required him to return appellees to the status quo.

*Id.* at 773-774; CERx's Post-Hearing Brief [Dkt. No. 83] at ¶ 16. *Sandefer*, however, is clearly distinguishable on its facts.

In *Sandefer*, the plaintiffs sought rescission of *their* purchases of Titan stock, so there was privity with respect to the rescission. Once that rescission occurred, Ballow was then held jointly and severally liable for the return of the purchase price due to his fraudulent conduct. Here, however, CERx seeks to rescind the License Agreements to which it is neither a party nor a third party beneficiary. There is simply nothing in *Sandefer* that supports CERx's position. Indeed, CERx did not cite to, nor could this Court find, any precedent holding that a stranger to a contract had standing to seek rescission of that contract. Thus, even if CERx were to be successful on Count 1 of the Complaint, the Court may not award the remedy it seeks as a matter of law.

### F.     CERx is Not Left Without a Remedy

In its post-hearing brief, CERx cautions this Court that a ruling in RPD's favor would permit debtors to effectively gut a secured lender's collateral without any consequences, to wit:

RPD is asking this Court to hold that a debtor can lawfully pledge trade secrets as collateral one day and the next day create a backdated document that transfers those trade secrets to the debtor's affiliate and when they both fail the creditor is left with no remedy. There is no money and the creditor cannot recover his

valuable intellectual property. Is this Court willing to write that opinion and thereby subject all secured creditors to this form of fraud?

Alternatively, RPD asks if this Court is willing to write an opinion holding that two companies can both, one affirmatively and the other by consent, tell the creditor that it will receive as collateral 100% fee simple title to valuable intellectual property knowing that the statement is a lie because they jointly signed a document two months earlier in which the owner transferred a substantial portion of those rights to the other and thereby take the creditor's money and keep the essential part of the stated collateral for the affiliate?

CERx's Post-Hearing Brief [Dkt. No. 83] at ¶¶ 5-6. Once again, the Court disagrees with CERx's characterization of its remedies (or lack thereof).

To put CERx's arguments into context, it is helpful to look at what its remedies would have been if the OnSiteRx-affiliated companies had not filed for bankruptcy. Presumably, CERx's lead claim would be that the License Agreements were fraudulent transfers under the Texas Uniform Fraudulent Transfers Act ("**TUFTA**"). Indeed, the Complaint contains allegations that appear to support such a claim, including that (1) PM was insolvent on March 8, 2011 and could not pay its debts as they came due, (2) the transactions were between affiliates and insiders, (3) PM retained possession of the Source Code after the transactions were complete, (4) no reasonably equivalent value was received for the License Agreements, and (5) the License Agreements were signed shortly before PM incurred substantial debt. Complaint at ¶ 68.

Here, however, the OnSiteRx-affiliated companies did file for bankruptcy protection and, once that occurred, the TUFTA-related claims became property of the licensor's (PM) bankruptcy estate. 11 U.S.C. § 541; *MortgageAmerica*, 714 F.2d at 1275-76. Had the PM trustee refused to bring the TUFTA-related claims against the licensees, case law establishes a procedure by which CERx could make demand upon the PM trustee and, if refused, petition this Court for permission to bring the claims itself. *See Louisiana World Expo. v. Fed. Ins. Co.*, 864

F.2d 1147 (5th Cir. 1989). However, Trustee Reed, on behalf of the PM estate, has filed TUFTA-related claims seeking to rescind the License Agreements between PM and each of Midland, San Antonio, Waco, Grapevine, W. Pa., Phoenix, and Alta Source. *See* Plaintiffs' Third Amended Complaint [Dkt. No. 75] (Counts 4 and 5).

Because CERx may not bring the TUFTA-related claims individually, it seeks to create a substitute cause of action that will permit it to step in line with Trustee Reed in seeking rescission of the License Agreements. As discussed above, however, the facts pleaded in the Complaint do not support the causes of action that CERx seeks to bring via Count 1 and, in any event, the Court could not grant the relief CERx requests.

In short, CERx had a state-law remedy that became property of the PM bankruptcy estate due to PM's bankruptcy filing. That remedy is being pursued by Trustee Reed for the benefit of the PM bankruptcy estate.

## IV.    CONCLUSION

Accepting the factual allegations in the Complaint as true, the Court concludes that, as to Count 1 of the Complaint, CERx has failed to plead sufficient facts to state a claim to relief that is plausible on its face. Accordingly, the Motion is hereby granted and Count 1 of the Complaint is dismissed.

**SO ORDERED.**

**# # # END OF MEMORANDUM OPINION AND ORDER # # #**